**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

INJURED WORKERS PHARMACY, LLC,

        Plaintiff,

  v.

SHAIRALY LISA ROSARIO AND
SUMMIT PHARMACY, INC.,

        Defendants.

CIVIL ACTION NO.:_____

---

## COMPLAINT

Plaintiff Injured Workers Pharmacy, LLC ("**IWP**" or "**Plaintiff**"), by and through its undersigned attorneys, files this Complaint against Defendants Shairaly Lisa Rosario ("**Rosario**") and Summit Pharmacy, Inc. ("**Summit**" with Rosario, "**Defendants**"), and respectfully states as follows:

### I.      PRELIMINARY STATEMENT

Rosario was a long-standing employee of IWP. Hired in June 2008, Rosario started at IWP as an Enrollment Specialist and worked her way up to the position of Territory Manager, a position which she held until she submitted her voluntarily resignation, which is effective May 14, 2020. Throughout her almost 12 years with IWP, Rosario had access to the Company's Confidential Information, including but not limited to IWP's client list, Referral Sources, sales data, proprietary training program, and marketing plans. Rosario also benefited from IWP's goodwill, reputation, and brand recognition to foster and maintain relationships with IWP's clients, Referral Sources, service providers, and key decision makers and influencers in the workers' compensation industry.

As a condition of her employment, Rosario entered into written agreements with IWP that contained non-competition, non-solicitation, and confidentiality provisions. Yet despite her legal

and contractual obligations, Rosario accepted employment with Summit, a workers' compensation pharmacy and known competitor of IWP. Summit tortuously interfered with IWP's contractual relationships and aided and abetted Rosario's bad acts by soliciting and inducing Rosario to breach her obligations not to compete with IWP, both while employed by IWP and for a period of one year following the termination of her employment with IWP.

IWP files this Complaint to preliminarily and permanently enforce the various covenants contained in the Non-Competition, Non-Solicitation and Confidentiality Agreement dated April 28, 2011, and the Non-Solicitation of Clients Agreement dated September 13, 2019, executed between Rosario and IWP, as well as IWP's rights under applicable law, in order to (i) stop Rosario from continuing to materially breach, among other things, her contractual, fiduciary, and other common law duties she owed, and continues to owe, to IWP; (ii) prevent Rosario from causing and inflicting further irreparable harm and injury on IWP by continuing to breach her contractual, fiduciary, and other common law duties she owed, and continues to owe, to IWP; and (iii) stop Summit from inflicting further irreparable harm and injury on IWP by continuing to interfere with its contractual relationships by soliciting and inducing IWP employees to breach their contractual obligations owed to IWP.

## II.  **PARTIES**

1.      Plaintiff IWP is a Massachusetts limited liability company. IWP is authorized to, and does business in the state of Massachusetts, with its principal place of business located at 300 Federal St., Andover, Massachusetts 01810.

2.      Defendant Rosario is an individual residing at 2518 NE 41st Ave., Homestead, Florida 33033. She may be served there or wherever else she is found.

3.     Defendant Summit Pharmacy, Inc. is an Arizona corporation, with its principal place of business located at 2320 W. Peoria Ave., Ste. D132, Phoenix, Arizona 85029.  Summit may be served with process by and through its registered agent, Catherine P. Egan, 13711 Camino Del Sol, #4, Sun City West, Arizona 85375.

### III.     JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1332 because the Parties are diverse and the amount in controversy exceeds $75,000.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to IWP's claims occurred in this judicial district, and Rosario entered into a written contract with IWP which requires that any dispute arising from the agreement be brought in the federal and state courts of Massachusetts, and Rosario further consented to the jurisdiction of those courts.

6.     This Court has subject matter jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

### IV.     FACTUAL BACKGROUND

**A.     IWP's Business**

7.     IWP is a home delivery pharmacy specializing in workers' compensation.  Based in Andover, Massachusetts, IWP is a licensed pharmacy in all 50 states and services injured workers throughout the country by providing home delivery of medications and other related services.  IWP has built an entire team around the workers' compensation system, which distinguishes it from a typical "neighborhood pharmacy."  IWP's patient support team works with the injured worker to collect their workers' compensation information, including information concerning their prescriptions, treating physician, and attorney.  IWP's pharmacy staff handles the

clinical needs of the injured employee and then delivers the medication to them, without delay, via home delivery.  IWP's claims team works with insurers, pharmacy benefit managers, and attorneys to coordinate payment to IWP so there are no upfront or out-of-pocket costs to the injured worker.

8.      Since it was founded in October 2001, IWP has invested a significant amount of its time and resources to develop a network of referral sources throughout the United States, including, but not limited to, law firms specializing in workers' compensation claims, physician groups, pain centers, doctors' practices, and insurers (collectively "**Referral Sources**").  As a result, IWP is well-regarded as an advocate for injured workers and enjoys widespread brand recognition and goodwill in the workers' compensation community.

9.      IWP currently employs 240 employees across the U.S.  The Company maintains an Employee Handbook that is distributed to employees.  *See* Ex. A-1.  IWP employees are generally required, both at the time of hire and whenever an updated handbook is issued, to review and execute a "Receipt and Compliance Acknowledgment," in which the employee acknowledges they have read, understood, and will comply with the rules and policies contained in the Employee Handbook.  Execution of this acknowledgment form is a condition of employment and of continued employment with IWP.  *See* Ex. A-2.

**B.      IWP's Reasonable Measures to Protect its Confidential Information**

10.      IWP has spent almost 20 years and made significant cash investments to develop its goodwill, brand recognition, relationships with clients and Referral Sources, marketing strategies, and proprietary processes, all of which it considers its confidential information.  IWP uses and relies on its confidential information to effectively compete and maintain its position as the advocate pharmacy for injured workers.  Accordingly, IWP takes reasonably calculated steps to protect its confidential information, as maintaining the confidentiality of its confidential

information is essential to the commercial success of the Company's business.  For example, the Employee Handbook, which every employee is required to abide by, contains a Confidentiality and Non-Disclosure policy which, among other things, compels all IWP employees to "protect the Company's Confidential Information and keep it secret."  *See* Ex. A-1. Employees are further required to use IWP's confidential information "only for the Company's benefit and only with the Company's permission," are prohibited from disclosing or providing such information to anyone outside of the Company, or using such information without prior approval.  *Id.*  Employees are also duty-bound to report any "unauthorized use, copying or disclosure of Confidential Information" to the Company and further notify IWP if the employee "believes that Confidential Information is being misappropriated, lost or disclosed."  *Id.*  The employee's obligation to maintain the confidentiality of IWP's Confidential Information survives the termination of the employee's employment with the Company.  *Id.*

11.     IWP also requires those employees who have access to the Company's confidential information to sign agreements with confidentiality, non-competition, non-solicitation, and other protective covenants as a condition of employment.  *See* Ex. A-3, A-4, and A-5.

12.     Additionally, IWP utilizes security measures to prevent the unauthorized access, use, and disclosure of its confidential information.  For example, all employees are required to enter a confidential, unique password to access the Company's computer networks, laptops, smart phones, and other electronic devices.  Further, certain of IWP's confidential information, including its client list, is stored in Salesforce, the Company's centralized, password-protected computer database.  IWP's client list, which is a compilation of its nearly 20 years of work in the workers' compensation industry, is a comprehensive list of every IWP client, and includes not only client contact information, but also additional notes and insight into each client.  The majority of IWP's

employees do not have access to Salesforce or IWP's client list, as the Company limits access to only those IWP employees with a need to know.  Further, IWP uses a single sign-on authentication to access Salesforce, which ensures that a user is locked out of the system once their account is deactivated.  IWP has expended, and continues to expend, significant funds to maintain the Salesforce pipeline.

13. To further maintain its competitive edge, IWP also utilizes the Salesforce data in connection with its financial metrics and data compiled over the last almost 20 years in the workers' compensation industry.  This allows IWP to provide additional insight into each customer's profile.  IWP's Sales Operation Department generates reports using IWP's internal data and metrics, which are not available to anyone outside of the Company ("**Confidential Data Reports**").  Only IWP's Finance and Sales Operation Departments can access these valuable Confidential Data Reports, though they may be shared with and utilized by the Company's sales team on a need-to-know basis.  If granted access, sales team members are prohibited from sharing the Confidential Data Reports with other Company employees.  Rather, each sales team member must individually request access and work with IWP's Finance Department to generate a specific Confidential Data Report.  The Confidential Data Reports and the data and metrics used to generate these reports are not public knowledge as they are key components in developing the marketing and sales strategies at both the Company-wide and sales team member level.

14. Further, upon termination of employment, IWP requires employees to return any confidential information they may have in their possession, custody or control.  The Company also reminds the departing employee of their continuing obligations owed to IWP, including their obligations not to retain, use, or disclose confidential information, and of any applicable restrictive covenants.  *See* Ex. A-6.

C.    **Rosario's Employment with IWP**

15.    IWP employed Rosario beginning June 24, 2008, until her voluntary resignation effective on or about May 14, 2020.  She was originally employed by IWP as an Enrollment Coordinator.  Rosario's Offer Letter from IWP set out the terms of her employment, one of which was a requirement that Rosario sign an agreement with confidentiality, non-competition, and other protective covenants.  *See* Ex. A-8.

16.    On June 13, 2008, Rosario entered into a Non-Competition and Confidentiality Agreement with IWP, which contained certain non-disclosure and non-competition duties that Rosario was obligated to abide by both during the term of her employment and after her employment terminated.

17.    On April 28, 2011, Rosario was promoted to a Senior Enrollment Coordinator position and signed a Non-Competition, Non-Solicitation and Confidentiality Agreement (the "**Non-Compete Agreement**").  By its express terms, the Non-Compete Agreement superseded the June 13, 2008 agreement. *See* Ex. A-4, ¶ 10.1.

18.    Under the terms of the Non-Compete Agreement, Rosario owed a duty of loyalty to IWP at all times while employed by the Company.  Specifically, she agreed to "apply [her] best efforts to [her] work, and will not do anything that could harm the Company, its employees, customers, or products." *Id.*, ¶ 1.1.  She also had a duty to "promptly tell the Company about any opportunity that related to the Company's business" and "not use such business opportunities for [her] own gain or for that of anyone else." *Id.*, ¶ 1.2

19.    The Non-Compete Agreement also contained certain non-competition, non-solicitation, and confidentiality restrictions which do not end with the termination of her employment with IWP.  Pursuant to the terms of the Non-Compete Agreement, Rosario promised

to maintain the confidentiality of IWP's Confidential Information; specifically, she promised as follows:

> **3.1 Promise to Protect.** Employee will protect the Company's Confidential Information [defined therein] and keep it secret. Employee will use it only for the Company's benefit and only with the Company's permission. Employee will not tell or give Confidential Information to anyone outside the Company, or use it for any other purpose, without first receiving the Company's permission. Employee will tell his/her supervisor if Employee believes another employee might be misusing Confidential Information.

*Id.*, ¶ 3.1.

20.    The Non-Compete Agreement defined "Confidential Information" to include, but not to be limited to the following:

> … information concerning: Referral Sources and their clients, general business operations; client information, including client contact and profile information; sales opportunities; internal employee lists; computerized databases of Referral Sources and client information; financial and accounting information, including profit and loss information and information about costs; sales and marketing strategies; methods of doing business and servicing clients, suppliers and Referral Sources; business forms developed by or for the Company; form and content of bids, proposals and contracts; the Company's internal reporting methods; technical and Company data, whether in writing, oral or machine-readable form; software programs, however embodied; and information obtained by or given to the Company about or belonging to its suppliers, clients, potential clients or others … all of which is confidential and proprietary in nature.

*Id.*, ¶ 2.1(a).

21.    Upon termination of her employment, Rosario was obligated to "promptly return all papers, electronic information and other data or property that contain any Confidential Information." *Id.*, ¶ 3.2.

22.    Rosario further agreed that while employed by IWP and for a period of 1-year immediately following the termination of her employment, whether voluntary or involuntary, and regardless of the reason for or the manner of her termination, she shall not:

> (a)    accept employment or establish any other relationship with a business within the Company Territories [as defined therein] that is in competition

with the IWP Business [as defined therein] or engage in any business or activity within the Company Territories that is in competition with the IWP Business at the time of the Employee's termination; provided, however, that the record or beneficial ownership of five (5) percent or less of the outstanding publicly traded capital stock of any entity shall not be deemed, in and of itself, to be in violation of this Section; or

(b)    solicit, divert or accept business on behalf of a competitor from a Referral Source or potential Referral Source [as defined therein], or otherwise offer products and services in competition with the IWP Business to a Referral Source or a potential Referral Source, (i) with whom Employee had contact while employed by the Company or (ii) about whom Employee obtained Confidential Information while employed by the Company (hereinafter a "Prohibited Referral Source").

(c)    solicit, divert or accept business from a client or potential client on behalf of a competitor, or otherwise offer products and services in competition with the IWP Business to a client or potential client, (i) with whom Employee had contact while employed by the Company; (ii) about whom Employee obtained Confidential Information while employed by the Company; or (iii) from whom Employee was referred or otherwise introduced by a Prohibited Referral Source (hereinafter a "Prohibited Client"); or

(d)    induce or attempt to induce any Prohibited Referral Source or Prohibited Client to reduce or terminate the business or referrals, as applicable, they direct to the Company; or

(e)    disclose the names or contact information of any Prohibited Client or Prohibited Referral Source to any other person, firm, corporation or other entity; or

(f)    hire any Company employee, or hire any former employee who worked for the Company at any time within the last year of Employee's employment, or encourage, solicit or induce any Company employee to leave the Company; or

(g)    assist any person, firm, entity, employer, business associate or member of Employee's family to commit any of the foregoing acts.

*Id.*, ¶ 5.2.

23.    "IWP Business" was defined to mean "a national pharmacy service to provide medications to injured workers receiving worker's compensation benefits and to provide services to law firms representing injured workers for the provision of such medications and

other services." *Id.*, at 1.  "Referral Sources" means those potential referral sources, including, but not limited to, workers' compensation attorneys, that the Company has repeated dealings with.  *Id.*  "Company Territories" was defined as "each and every state or territory in which Employee conducted, transacted or solicited business on behalf of Company, within the twenty-four (24) months immediately preceding the date of Employee's termination and up to and including the date of Employee's termination."  *Id.*, ¶ 5.3.

24.     Additionally, Rosario agreed that if she violated any provision of the Non-Compete Agreement, any of the time limitations—including the 1-year prohibitions on her unlawful competition and solicitation—would "be extended for a period of time equal to the period of time during which such breach occurs but no longer than the time limitations" in the Non-Compete Agreement.  *Id.*, ¶ 6.2.

25.     The Non-Compete further states: "In the event that Employee violates any of the covenants contained in this Agreement and the Company is required to seek enforcement of such in any court having jurisdiction, Employee shall be responsible for all reasonable attorney's fees and costs incurred by the Company in the successful enforcement of this Agreement, in addition to any damages sustained by the Company as the result of the violations." *Id.*, ¶ 6.1.

26.     On July 28, 2014, Rosario was promoted to an Account Manager position.  *See* Ex. A-9.  She was assigned the South Florida Territory.  Rosario remained bound by the obligations and restrictions contained in the Non-Compete Agreement.  *See* Ex. A-4 and A-9.

27.     Prior to her employment with IWP, Rosario had no experience in the workers' compensation industry nor any relevant relationships with Referral Sources.  *See* Ex. A-10.  Once employed by IWP, any business expenses Rosario incurred to develop these relationships were paid for by the Company.

28.     As an Account Manager, Rosario was responsible for closing sales through self-generated efforts, networking, cold-calling, territory planning, and other sales-related activities.  Rosario acted as the direct liaison between the Company and its clients and managed communications between the parties concerning any claims or payment issues.  If a claim was resolved, Rosario tracked that with the Company's Litigated Claims Department to prepare for settlement and collection.   Rosario also worked hand-in-hand with the Company's Sales Operations Department, which provided her real-time market information and strategies to help her prospect, develop and maintain business relationships to drive sales.  As an Account Manager, Rosario was granted access to Salesforce and the Company's confidential information, including certain Confidential Data Reports.

29.     Rosario was also responsible for cultivating relationships with IWP's current and prospective Referral Sources.  Accordingly, she identified and connected with decision makers and influencers to gain buy-in from them.  She communicated to them IWP's unique value proposition for services through in-person sales presentations and electronic communications. Rosario also built strong business relationships with IWP's client list to gain additional referrals. Much of Rosario's work time was spent networking, so IWP could establish and maintain effective working relationships throughout a variety of industries, not exclusive of healthcare, medical devices, local unions, or patient advocacy groups.

30.     To further cultivate business, drive brand awareness, and stay connected with current and prospective Referral Sources influential to IWP's business, Rosario was required to devote a significant amount of her working time to charitable and community organizations.  IWP paid membership dues and made donations to ensure Rosario had access to these key

organizations, which include the Friends of 440, the Inns of Court of Miami, and the Florida Workers Association.

31.     IWP's investment of time, money, and manpower in these influential organizations provided Rosario access to key influencers in the workers' compensation community.   For example, IWP is a platinum sponsor and the only pharmacy who is a member of the Friends of 440, a charitable organization that provides scholarships to children whose parents died as a result of a workplace accident, and an organization in which most Florida-based IWP Referral Sources are members.   IWP used its platinum sponsorship and donation dollars as a means to introduce Rosario to the Friends of 440 to facilitate networking with its members.   As a result of IWP's efforts, Rosario serves on the Board of Directors for the Friends of 440 and, upon information and belief, will retain that key position even though her employment with IWP has terminated, and despite the fact that Summit is not a member of the Friends of 440, nor has it made any investment of time or money in the organization.

32.     Effective January 1, 2019, and in an effort to create alignment and consistency within the Company's sales organization, Rosario's job title changed from Account Manager to Territory Manager.   *See* Ex. A-11.   However, Rosario's job duties remained unchanged. *See* Ex. A-12.   Rosario maintained her access to, and IWP continued to disclose its confidential information to her.   She also remained bound by the obligations and restrictions contained in the Non-Compete Agreement.   *See* Ex. A-4 and A-11.   Specifically, Rosario agreed that the Non-Compete Agreement would continue to apply regardless of any change to her job (including, specifically, a promotion), as she agreed that the "obligations and restrictions contained in [that] Agreement survive and continue to apply" to Rosario.   *See* Ex. A-4, ¶ 9.1.

33.     Her non-solicitation obligations under the Non-Compete Agreement were amended on September 13, 2019, when she executed a "Non-Solicitation of Clients Agreement" ("**Non-Solicitation Agreement**").   *See* Ex. A-5.   Specifically, Rosario agreed that during her employment with IWP and for a period of 12 months following the termination of her employment with the Company, whether voluntary or involuntary, directly or indirectly, she would not

> solicit or attempt to solicit any current clients or customers of the Company with whom the Employee had material or direct contact or about whom the Employee received confidential information during the last twelve (12) months of the Employee's employment with the Company in the geographic area(s) in which the Employee made sales or provided services for the Company, for the purpose of offering or accepting goods or services similar to or competitive with those offered by the Company.

*Id.*, at 1.

34.     Pursuant to the terms of the Non-Solicitation Agreement, Rosario was further obligated to (i) notify her new employer of her continuing obligations under the Non-Solicitation Agreement, (ii) notify IWP of the identity of her new employer and her job title and responsibilities, and (iii) continue to so inform the Company in writing any time she changes employment during the 12 month period following the termination of her employment with IWP. *Id.* The Non-Solicitation Agreement, by its terms, did not supersede the Non-Compete Agreement. *See id.*

**D.     IWP's Proprietary Training Program for Territory Managers**

35.     A considerable investment of time and money is necessary for IWP to train a newly hired Territory Manager in its service offerings, sales strategies, and other aspects of their job. New Territory Managers also need time to establish relationships with related sales professionals within the Company as well as IWP's clients, service providers, and Referral Sources.  To be effective in their new position, Territory Managers must also experience a complete sales cycle, from lead generation to closure of sales.

36.     IWP has invested both time and money to develop a proprietary 9-week training program for its newly hired Territory Managers.  Generally, new Territory Managers spend a week at IWP's corporate headquarters where they learn about the Company and, among other things, its marketing strategies, service offerings, and support.  They then spend several weeks in the field shadowing multiple, established Territory Managers, including Rosario, who provide field training.  The new Territory Manager then returns to their assigned territory where they work under the supervision and guidance of their assigned Director of Regional Sales to cultivate business relationships and drive sales.

37.     Given the learning curve, IWP usually sustains a loss in sales for a year, as it typically takes a full year before a new Territory Manager can effectively perform their job duties and reach and maintain the Company's sales goals.

**E.      Rosario Accepts Summit's Employment Offer**

38.     On April 30, 2020, Rosario notified IWP that she was voluntarily terminating her employment effective May 14, 2020.  *See* Ex. A-13.  In a follow-up communication with Don Gelnaw, Director of Regional Sales – S.E., Rosario indicated she had accepted an offer of employment from Summit.

39.     Based on a recent review of Summit's online webpage the following facts are believed to be true regarding Summit:  Summit is a direct competitor of IWP and, upon information and belief, employs a business model similar (if not identical) to IWP.  Like IWP, Summit specializes in the workers' compensation industry as a "workers' compensation pharmacy dedicated to delivering doctor-prescribed medications to injured workers, auto accident victims and others."  Also like IWP, Summit specializes in home delivery of medication to injured workers, without delay or expense to them.  Again like IWP, Summit employs a claims team to manage

claims for patients, attorneys and doctors nationwide. Summit represents it is licensed in all 50 states and serves thousands of patients across the United States.

**F.      IWP Sent Demand Letters to Rosario and Summit**

40.      On May 1, 2020, IWP sent Rosario a letter reminding her of her fiduciary duties owed to IWP as an employee of the Company. *See* Ex. A-6. IWP also reminded Rosario of the restrictive covenants contained in her Non-Compete Agreement and Non-Solicitation Agreement. *Id*. IWP demanded that Rosario fully disclose the title, nature, and duties of the position she had accepted with Summit and explain how that position does not violate her obligations to IWP. *Id.* IWP also demanded Rosario affirm she had not disclosed any IWP information to Summit, taken steps to transition IWP business to Summit, or solicit IWP's employees on Summit's behalf. *Id.* Rosario responded to request 2 extensions of her time to respond, and in her final correspondence, she disputed her continuing obligations to the Company.

41.      IWP sent a similar letter to Summit on May 1, 2020. *See* Ex. A-7. IWP notified Summit of the continuing obligations Rosario contractually owed to IWP and the fiduciary duties she owed to the Company as an employee of IWP. *Id.* IWP demanded Summit disclose the title, nature, and duties of the position Summit had offered, and which Rosario had accepted, and explain how that position did not violate her obligations to IWP. *Id.* The Company further demanded that Summit confirm (i) whether Rosario disclosed to Summit her continuing obligations owed to IWP, (ii) whether Rosario had disclosed any of IWP confidential or proprietary information to Summit, (iii) whether Rosario had transitioned, or taken steps to assist with the transition of, business from IWP to Summit, (iv) whether Rosario had recruited, or attempted to recruit, other IWP employees on Summit's behalf, and (v) that Rosario would not be asked by anyone, or permitted to, directly or indirectly, violate her obligations to IWP. *Id.*

42.     IWP further reminded Summit that it previously was forced to address similar concerns after IWP learned Summit had employed Jenna Kunze, formerly employed by IWP as a Territory Manager.  Accordingly, IWP demanded Summit also confirm whether or not Kunze in any way participated in recruiting Rosario to Summit and, if so, the manner of her participation. Summit also requested 2 extensions of its time to respond, and in its final correspondence, failed to provide the requested information or written affirmation to IWP.

## V.     CAUSES OF ACTION

### Count I

### (Breach of Contract Against Rosario — Non-Competition)

43.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

44.     Rosario's Non-Compete Agreement is a valid, enforceable contract between Rosario and IWP.  At all times relevant to this lawsuit, Rosario has been bound by the restrictive covenants contained in Sections 2, 3, and 5 of the Non-Compete Agreement.  These provisions constitute a binding and enforceable contract between Rosario and IWP, supported by adequate consideration in the form of continued employment, access to Confidential Information, and specialized training.

45.     The purpose of the restrictive covenants are to protect the business goodwill, trade secrets, and confidential information belonging to IWP.  The limitations set forth in the restrictive covenants as to time, geography, and scope of activity to be restrained are reasonable and do not impose a greater restraint than necessary to protect IWP's legitimate business interests.

46.     Rosario has violated, and will violate the Non-Compete Agreement by: (i) competing with IWP in violation of the non-compete provision by accepting Summit's employment offer, and (ii) competing with IWP in violation of the non-compete provision by establishing an employment

relationship with Summit to develop business in competition with IWP.  Given the position Rosario will hold with Summit and her corresponding job duties, it is inevitable that Rosario will further breach her Non-Compete Agreement by misappropriating IWP's confidential and proprietary information and trade secrets, including but not limited to IWP's client list and Referral Sources, and by soliciting, either directly or indirectly, IWP's clients and Referral Sources on Summit's behalf.

47.     As a result of Rosario's breach of her Non-Compete Agreement, IWP has suffered and will continue to suffer irreparable harm and other damages, including but not limited to the loss of current and prospective sales, loss of goodwill, loss of profits, loss of value of trade secrets, loss of client relationships, loss of referral relationships, and loss of prospective advantageous relationships.

48.     Rosario's breach of the Non-Compete Agreement has made it necessary for IWP to engage counsel to assert this claim.  Under the Non-Compete Agreement, Rosario is liable for all attorneys' fees and costs incurred by IWP to enforce the Non-Compete Agreement, including the non-competition provision, and IWP seeks recovery of same.

## Count II

**(Breach of Contract Against Rosario — Duty of Loyalty)**

49.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

50.     Rosario's Non-Compete Agreement is a valid, enforceable contract between Rosario and IWP.

51.     Rosario owed a duty of loyalty to IWP, as expressly agreed to in the Non-Compete Agreement.  Specifically, Rosario agreed to apply her best efforts to her work and not do anything that could harm IWP, its employees, customers, or products.

52.     For at least the 30 days prior to voluntarily terminating her employment with IWP, Rosario failed to apply her best efforts in her work, resulting in lower productivity and lost sales.  For these reasons, Rosario has breached her Non-Compete Agreement.

53.     As a result of Rosario's breach of the Non-Compete Agreement, IWP has suffered or will continue to suffer irreparable harm and other damages, including but not limited to the loss of current and prospective sales, loss of goodwill, loss of profits, loss of value of trade secrets, loss of customer relationships, loss of referral relationships, and loss of prospective advantageous relationships.

54.     Rosario's breach of the Non-Compete Agreement has made it necessary for IWP to engage counsel to assert this claim.  Under the Non-Compete Agreement, Rosario is liable for all attorneys' fees and costs incurred by IWP to enforce the Non-Compete Agreement, including the duty of loyalty provision, and IWP seeks recovery of same.

### Count III

### (Breach of Fiduciary Duty Against Rosario)

55.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

56.     As an employee of IWP, Rosario had a legal duty to act in the best interest of IWP. Rosario had a duty to exercise diligence and good faith in matters relating to her employment and to not engage in disloyal acts.  Rosario has failed to uphold her obligations.

57.     For at least the 30 day period leading up to her voluntary resignation, Rosario was not diligent in her work duties and failed to act in good faith as an employee of IWP.  Instead, Rosario engaged in disloyal acts which resulted in lower productivity and lost sales.

58.     As a result of Rosario's breach of her fiduciary duties to IWP, the Company has suffered or will continue to suffer irreparable harm and other damages, including but not limited to the loss of current and prospective sales, loss of goodwill, loss of profits, loss of value of trade secrets, loss of customer relationships, loss of referral relationships, and loss of prospective advantageous relationships.

**Count IV**

**(Tortious Interference with Contractual Relations Against Summit)**

59.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

60.     Rosario is a party to a valid, enforceable contract with IWP whereby Rosario is prohibited from accepting employment or establishing a business relationship with a competitor of IWP within the "Company Territories" both during the term of her employment with IWP and for the 1 year period immediately following the termination of her employment with IWP.

61.     Summit was aware, or should have been aware, of Rosario's contractual obligations to IWP.

62.     Summit intentionally, improperly, and without privilege interfered with the restrictive covenants between Rosario and IWP by, among other things, soliciting Rosario and inducing her to accept Summit's offer of employment, in violation of her Non-Compete Agreement.

63.     Summit has acted with improper motives or used improper means in interfering with IWP's contractual relationship with Rosario, including but not limited to misappropriating IWP's investment in its employees, misappropriating IWP's employee expertise and know-how, harming IWP's goodwill, and/or unfairly harming IWP's business.

64.     Summit had no legitimate business reason or justification to do these acts.

65.     As a result of Summit's tortious interference, IWP has suffered or will suffer irreparable harm and other damages including but not limited to, loss of its investment in its employees, loss of employee expertise and know-how, damage to goodwill, loss of current and prospective sales, loss of profits, loss of value of trade secrets, loss of customer relationships, loss of prospective advantageous relationships, and loss of confidential, proprietary and/or trade secret information.

## Count V

### (Aiding and Abetting Breach of Contract Against Summit)

66.     Plaintiff hereby incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

67.     Rosario is a party to a valid, enforceable contract with IWP whereby Rosario is prohibited from accepting employment or establishing a business relationship with a competitor of IWP within the "Company Territories" both during the term of her employment with IWP and for the 1 year period immediately following the termination of her employment with IWP.

68.     Summit was aware, or should have been aware, of Rosario's contractual obligations to IWP.

69.     Rosario breached her contractual obligations to Plaintiffs.

70.     Summit actively participated in, substantially assisted, and/or substantially encouraged Rosario to breach her contractual obligations to IWP, including but not limited to allowing, encouraging, or inducing Rosario to accept Summit's job offer and breach her Non-Compete Agreement.

71.     As a result of Summit's aiding and abetting of Rosario's breach, IWP has suffered or will suffer irreparable harm and other damages including but not limited to, loss of its investment in its employees, loss of employee expertise and know-how, damage to goodwill, loss of current and prospective sales, loss of profits, loss of value of trade secrets, loss of customer relationships, loss of prospective advantageous relationships, and loss of confidential, proprietary and/or trade secret information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1.     An award of monetary damages in an amount to be determined at trial;

2.     Pre- and post-judgment interest as permitted by law;

3.     An award of the attorneys' fees and costs against only Rosario pursuant to the Non-Compete Agreement;

4.     Injunctive relief; and

5.     For such other and further relief as the Court deems appropriate and equitable under the circumstances.

EAST\174057750.3

Respectfully submitted,

Paul B. Lewis (BBO # 690793)
paul.lewis@dlapiper.com
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110
Tel.:      (617) 406-6000
Fax:      (617) 406-6100

Dated:  May 8, 2020

and

Marc D. Katz (*pro hac* application forthcoming)
Texas State Bar No. 00791002
marc.katz@dlapiper.com
Isabel A. Crosby (*pro hac* application
forthcoming)
Texas State Bar No. 24050226
isabel.crosby@dlapiper.com
Allison A. Reddoch (*pro hac* application
forthcoming)
Texas State Bar No. 24076912
allison.reddoch@dlapiper.com
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 743-4500
Facsimile:  (214) 743-4545

*Attorneys for Injured Workers Pharmacy, LLC*